**Perry McNEELY**

v.

**Angee WALSH.**

**Civil Action No. 97–1187.**

United States District Court, E.D. Louisiana.

Feb. 12, 1998.

Julian J. Rodrigue, Sr., Rodrigue & Rodrigue, Covington, LA, for Plaintiff.

Kenneth R. Bowen, Douglas Watson Redfearn, George Jeffrey Rizzo, Simon, Peragine, Smith & Redfearn, LLP, New Orleans, LA, Harry Platton, Pastuszek, Jr., Pastuszek & Associates, Mandeville, LA, for Angee Walsh.

## ORDER AND REASONS

FALLON, District Judge.

This case comes before the Court on defendant's motion for summary judgment. Because the Court finds that genuine issues of material fact exist, the motion is HEREBY DENIED.

Plaintiff, a pilot with Trans World Airlines, married defendant's daughter, Taleese, in 1990. At the wedding reception, the plaintiff allegedly touched and "french kissed" a then fourteen year-old guest. In 1991, the plaintiff was charged in the 22nd Judicial District Court with four counts of indecent behavior with a juvenile, by commission of a lewd or lascivious act upon the persons of five separate minors. The five girls, ranging in ages from eleven to sixteen, provided testimony during the preliminary examination. They detailed the actions of the plaintiff, who owned the Mini–Golf operation at which they worked. Pl.Ex. 10. They accused him of frequently offering money, cars, and lodging in exchange for sex. They described, in somewhat lurid detail which the Court need not go into for the present motion, plaintiff fondling and kissing them and attempting to evade detection. Under the strain of these charges, Taleese alleged that plaintiff informed her that he had taken pills and wished to die with her in his arms, that plaintiff grabbed her and held her to the bed, and that Taleese escaped and phoned the defendant. As people gathered in the aftermath of the possible suicide attempt, there is counter testimony that in fact there had been no suicide attempt, and that Taleese called defendant and informed her of this.

Plaintiff subsequently entered a guilty plea to contributing to the delinquency of a minor. Taleese alleges that she thereafter discovered a letter to defendant with a Finland postmark stating "I can't leave Finland till I'm 18," and asking for money. The plaintiff and

Taleese divorced in 1993, and Taleese became the custodial parent of the couple's only child.

On March 14, 1994, in the midst of a custody dispute involving the plaintiff and Taleese, the defendant called the Federal Aviation Administration (FAA) hotline set up to allow callers to report suspected violations of Federal Aviation Regulations. Defendant alleged that plaintiff had "attempted suicide about 3o and may have attempted suicide recently," and had "been arrested for indecent behavior with minors and entered a plea bargain." (Aviation Safety Hotline Brief, 3/15/96). Plaintiff was temporarily removed from flight status, allegedly resulting in loss of pay and benefits, as well as exposure to public ridicule and humiliation. After an internal investigation, he was declared fit to fly, and returned to duty.

Plaintiff brought suit in state court, alleging that defendant's remarks were defamatory. Defendant removed the case to federal court. Defendant now moves for summary judgment on four alternative grounds. First, plaintiff's defamation suit is preempted by federal aviation laws and policies. Second, callers to the Aviation Safety Hotline are absolutely immune from suit under federal common law. Third, defendant is entitled to qualified immunity under federal common law. Fourth, defendant is entitled to qualified immunity under Louisiana defamation law.

## A. ANALYSIS

### 1. Preemption

■ Defendant argues that allowing a state law defamation suit to go forward in this case would deter callers from phoning the hotline, and would greatly interfere with the ability of the FAA to gather necessary information to assure pilot safety. Thus, such suits conflict with federal aviation law or policy, and must be preempted. Defen-

dant cites to then Secretary of Transportation Elizabeth Dole's press release announcing the creation of the hotline. Dole stated that

individuals with information about safety violations do not contact the FAA for fear of being identified. Our new hotline will permit those with knowledge of false record keeping or other unreported violation to alert federal officials without fear of recrimination.

The law to be applied to determine preemption is the preemption language of the Federal Aviation Administration Authorization Act of 1994 (FAAAA). It specifically bars a state from enacting or enforcing a law "related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). Defendant argues that applying defamation law would relate to a "service," since it arguably hampers exposing unfit pilots. While an intuitively appealing, and certainly well-crafted and briefed argument, a review of this Circuit's handling of suits that appear to relate even more directly to aviation service shows this Circuit's unwillingness to read "service" broadly when facing preemption questions under the FAAAA and the law it superseded, the Airline Deregulation Act (ADA), an act which contained identical "relating to rates, routes or services" preemption language [1]

*Hodges v. Delta Airlines*, 44 F.3d 334 (5th Cir.1995), is the Circuit's most thorough analysis of preemption under the ADA. Plaintiff in Hodges sued the airline for damages based on alleged airline negligence when one passenger dropped a box from an overhead container on her arm. The Court held that such a claim was not preempted. Significantly, the Circuit explained the intent of the ADA, as "an economic deregulation statute," preempting state law when preemption would "prevent the states from frustrating the goals of deregulation by establishing or maintaining economic regulations of their own." *Id.* at 335. The Circuit found that

1. The cases below discuss identical preemption language in the ADA, not the FAAAA. Defendant has not argued that the fact that the FAAAA has replaced the ADA changes the analysis. Indeed, the history surrounding the bill would not support such an argument. President Clinton's speech upon signing the FAAAA discussed "our successful economic program" as a "foundation for the much better financial results we see in the aviation sector." Statement of William J. Clinton Upon Signing H.R. 2739, 1994 WL 609379 (Leg.Hist.). He stated that he fully expected that "this legislation will have effects similar to those of the 1980 deregulation law." *Id.* It is unlikely that the Circuit's analysis of identical preemption language in a law so closely aligned with the ADA would change.

"the ADA was concerned solely with economic deregulation," and defined "services" in terms of "the element of bargain" and concern over "the contractual arrangement." *Id.* at 336.

The Circuit recognized that *Morales v. TWA,* 504 U.S. 374, 112 S.Ct. 2031, 2037–38, 119 L.Ed.2d 157 (1992) read preemption as broader than only those state laws "actually prescribing rates, route or service," or "specifically addressed to the airline industry," or where state law was inconsistent. *Hodges,* 44 F.3d at 336 (citations omitted). However the Circuit pointed to *Morales'* language explaining that state laws are "only preempted if they have the 'forbidden significant effect,'" and *Morales'*s language that "acknowledged, however, that 'some state actions may affect [airline services] in too tenuous, remote or peripheral a manner' to be preempted." *Hodges,* 44 F.3d at 336 (citations omitted).

The Circuit specifically criticized a "facile analogy to *Morales* and the ERISA preemption cases," which might "suggest that 'services' includes all aspects of the air carrier's 'utility' to its customers, and hence, any state tort claim may 'relate to' services as a result of its indirect regulatory impact." *Hodges,* 44 F.3d at 338 (citations omitted). The Circuit noted that federal courts should "not displace state police powers ... unless that was the 'clear and manifest purpose of Congress,'" and concluded that enforcement of such tort duties normally will not have the "'forbidden significant effect' on airline's services." *Id.* at 338–39.

In the *Smith v. America West Airlines* case decided the same day as *Hodges,* the Circuit held that even a claim that the airline was negligent in permitting a visibly deranged hijacker to board did not "relate" directly enough to "service" to warrant preemption. 44 F.3d 344 (5th Cir.1995). The Circuit cautioned that "courts should not

lightly infer in federal actions an attempt to preempt traditional state police powers." *Id.* at 346. Even though recovery could "affect the airline's ticket selling, training or security practices," it would not regulate the economic or contractual aspects of boarding, and any such effect would be "'too tenuous, remote or peripheral' to be preempted." *Id.* at 347.

The Circuit seems to guide this court to find ADA preemption of state laws only where there is a direct economic effect. For instance, in *Sam L. Majors Jewelers v. ABX,* 117 F.3d 922, 931 (5th Cir.1997), the Court found that the Texas Deceptive Trade Practice–Consumer Protection Act was preempted by the ADA. The Circuit found that if given effect in the case, "the Texas act would impose its substantive standards on service provided by an air carrier—a result not permitted by the ADA." *Id.* at 931.

■ The Circuit has narrowly construed any charge that state law is preempted by the "related to ... services" language, even in instances where the impact seems more direct than in the case currently before the Court. The issue here does not even involve a suit against an airline, but only against a private individual with no direct involvement with the airline industry. The impact to service from allowing a tipster's contact with a hotline to be actionable under state defamation law is truly "tenuous, remote or peripheral," and so unlikely to have the "forbidden significant effect" that would warrant preemption of state defamation law.[2]

### 2. & 3. Absolute or Qualified Immunity under Federal Common Law

■ Defendant asserts that even if state defamation law is not preempted outright, the Court should create a federal common law rule that callers to the safety hotline have absolute immunity, or recognize that the defendant in this case was qualifiedly

**2.** *Nietert v. Overby,* 816 F.2d 1464 (10th Cir. 1987), discussed at length below in reference to defendant's second argument, dealt with a government employee who reported her supervisor to a non-FAA federal hotline and was charged in state court with defamation. The case was removed, and the Court allowed the defamation charge to proceed. The Eleventh Circuit affirmed the district court's post-trial finding of

official immunity from the common law tort claim of defamation, because defendant was an official acting within the scope of her official duties at the time that she made the call. Neither the trial judge nor the circuit saw fit to dismiss the claim on grounds that state defamation claims are preempted because the forum for the remarks was a federal hotline for reporting violations.

immune under federal common law. Because such a creation or extension would be misguided, the Court must decline to do so.

Defendant cites *Nietert v. Overby,* 816 F.2d 1464 (10th Cir.1987), in which the trial judge granted official immunity from state defamation proceedings to a government employee who reported her supervisor to a federal hotline. However, *Nietert* involved not only a government official as the victim of the alleged defamation, but, more importantly, a government caller who made the call within the scope of her official duties. The court made the "discerning inquiry into whether the contributions of immunity to effective government in [this] particular context outweigh the perhaps recurring harm to individual citizens." *Nietert,* 816 F.2d at 1468 (citing *Doe v. McMillan,* 412 U.S. 306, 93 S.Ct. 2018, 2028, 36 L.Ed.2d 912 (1973)). The court affirmed the trial judge, but conceded that the case was a "close call." *Nietert,* 816 F.2d at 1466. More importantly, the absolute immunity extended only to a government agent acting within the scope of her duties and thus was really official immunity. The rights and duties of the United States were called directly into play.

When the action does not directly implicate the rights and duties of the United States, to fashion federal common law a court must find "an overriding federal interest in the need for a uniform rule of decision or where the controversy touches basic interests of federalism." *Illinois v. City of Milwaukee,* 406 U.S. 91, 92 S.Ct. 1385, 1393, n. 6, 31 L.Ed.2d 712 (1972). Courts looking at allegedly defamatory statements made in undeniably federal forums have found no such overriding federal interest or controversy touching on basic interests of federalism, and thus have applied state defamation law.

In *Bio/Basics Int'l Corp. v. Ortho Pharm. Corp.,* the court addressed allegedly defamatory statements made before a Senate subcommittee. 545 F.Supp. 1106 (S.D.N.Y. 1982). Despite finding that there is "undeniably a federal interest in enabling witnesses who appear before federal legislative committees to know in advance the likelihood that their testimony will cause them to be subjected to tort liability," the court concluded that "this federal interest in uniformity and predictability of result is insufficiently paramount to provide a basis for the creation of federal common law." *Id.* at 1112. Similarly, in *Yip v. Pagano,* another defamation action arising out of remarks made by a witness, this time before a House subcommittee, the court recognized the "distinct need for witnesses to testify without the fear of facing private defamation actions" and conceded that with an absolute privilege, "the legislature will be aided in obtaining full and frank testimony." 606 F.Supp. 1566, 1570 (D.N.J.1985). Still, the court held that "such an independent policy determination is, absent a paramount federal interest in a uniform rule of law, not to be made by a federal district judge through the creation of federal common law," and advised that if "a federal rule of law is necessary, we leave it to Congress to enact."[3] *Id.*

Calls to a federal hotline do not touch any more basic interests of federalism, nor provide a more overriding federal interest in the need for a uniform rule of decision, than when a witness testifies on the very floors of Congress. While defendants again make a persuasive and thorough presentation, the court finds the creation or extension of federal common law immunities in the area of defamation is not warranted.[4]

3. Where Congress has spoken, the analysis is of course quite different. For instance, for a defamation claim predicated upon allegedly false statements made in connection with the settlement of a grievance procedure under the Labor Management Relations Act (LMRA), the court found that such "defamation claims predicated upon allegedly false statements made during the course of a grievance or arbitration procedure are preempted under Section 301." *Crawford v. TRW, Inc.,* 815 F.Supp. 1028, 1035 (E.D.Mich. 1993).

4. Furthermore, as to the qualified immunity issue, "the standard way in which federal courts make federal common law is by adopting the law of the state whose law would govern in the absence of federal law, subject to the implicit proviso that the adopted state law be consistent with federal policy," and "defamation is an area of state law, and the various defamation privileges are an integral part of the law of defamation." *Baravati v. Josephthal, Lyon & Ross, Inc.,* 28 F.3d 704, 707, (7th Cir.1994). Thus, even if the court were to craft a common law qualified

#### 4. Qualified Immunity Under Louisiana State Law

■ Defendant's last grounds for summary judgment is that the defendant is qualifiedly immune under Louisiana law. For a non-public figure, defamation requires "(1) defamatory words; (2) publication; (3) falsity; (4) actual or implied malice; and (5) resulting injury." *Guilbeaux v. Times of Acadiana, Inc.*, 693 So.2d 1183 (La.App. 3d Cir.), *writ denied* 701 So.2d 1327 (1997). While counsel discuss the *New York Times v. Sullivan* standard and actual malice, the court notes that actual malice, and proof of actual malice by clear and convincing evidence, is a Constitutional requirement imposed by the Supreme Court only for public figures. *New York Times v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Defendant does not argue that plaintiff could qualify as either a true public figure, or even as limited purpose public figures for a limited range of issues, as set out in *Trotter v. Jack Anderson Enterprises, Inc.*, 818 F.2d 431, 433 (5th Cir.1987). The Court finds independently as a matter of law that plaintiff is not a public figure.

Applying the facts of this case to the elements of non-public figure defamation law, defamatory words and publication are present, and by being subjected to the internal investigation and being temporarily removed from duty, there is a resulting injury. Furthermore, defendant has chosen to stipulate, for purposes of this motion only, that the statements were not in fact true. The only element in contention at this point is whether a reasonable jury could find that defendant acted with actual or implied malice. Under Louisiana law, where the words, "without reference to their context, amount to accusation of a crime or similar conduct ... malice and injury are presumed." *Rouly v. Enserch Corp.*, 835 F.2d 1127, 1129 (5th Cir.1988) (citing *Crump v. Crump*, 393 So.2d 337, 339 (La.App. 1st Cir.1980)). "In Louisiana, accusation of a crime is considered defamatory per se." *Davis v. Borskey*, 643 So.2d 179, 183 (La.App. 1st Cir.1994), *aff'd* 660 So.2d 17 (La.1995). Thus, as defendant appears to have accused the plaintiff of crimes of indecent behavior with minors, implied malice is

satisfied, and all the elements of defamation are present.

Defendant raises the affirmative defense of qualified immunity, referred to as conditional privilege under Louisiana law. As set forth most fully in *Smith v. Lady of the Lake Hospital, Inc.*, conditional privilege can be raised as an affirmative defense to defamation where the defendant establishes that he made a statement "(1) in good faith (2) on a matter in which he had an interest or a duty (3) to another person with a 'corresponding interest or duty.'" 639 So.2d 730, 743 (La. 1994) (citing *Rouly*, 835 F.2d at 1130.) According to *Rouly*.

> Good faith or lack of malice does not mean lack of hostility or ill feeling; it means that the person making the statement must have reasonable grounds for believing that it is true and he must honestly believe that it is a correct statement.

835 F.2d at 1130.

The Louisiana Supreme Court has established a two step analysis for determining a conditional privilege. First, the "attending circumstances of a communication" must "occasion a qualified privilege." *Smith*, 639 So.2d at 745. This step is "generally to be determined by the court as a matter of law," *Id.* The Court finds that a call reporting suspected violations to a federal hotline created for just this purpose should occasion this privilege. Thus, the first step is satisfied.

Once the defendant has established that a qualified privilege existed, the second step requires that "the grounds for abuse [of the privilege]—malice or lack of good faith—be defined." *Id.* at 746. It is the "plaintiff's burden to come forward with specific evidence of malice and bad faith, as opposed to broad, unsubstantiated allegations." *Id.* Plaintiff has submitted specific evidence of malice and bad faith. For instance, the defendant did not call until years after the molestation of the girls and the alleged attempted suicide described above took place, and only after defendant's daughter was served with a Rule to Show Cause concerning visitation rights for the plaintiff. The hearing was set for March 20, 1996 and

---

immunity, it would not likely be different than     the law of Louisiana.

defendant called on March 14, 1996. Plaintiff also attached affidavits of witnesses who claim that they heard Taleese tell the defendant that there had been no attempted suicide. This is evidence that the defendant knew that there had been no suicide attempt and had no good faith belief for her comments. Plaintiff has prevailed on the second step.

Furthermore, this second step, the abuse of conditional privilege or malice, is "generally a fact question for the jury." *Smith*, 639 So.2d at 730. This presumption is further compounded by the facts not properly placed before the Court, such as defendant's sworn deposition testimony, and the contents and relevancy of the letter defendant supposedly sent to the FAA. Where, as here, there is not "only one conclusion [that] can be drawn from the evidence,"[5] the Court may not decide the issue on summary judgment.[6]

For the foregoing reasons, defendant's motion for summary judgment is HEREBY DENIED, reserving to defendant the right to reurge its motion as it relates to its fourth argument, that the defendant is not liable under Louisiana defamation law.

---

5. *Id.*

6. Under Louisiana law, "summary judgment is favored in defamation cases." *Romero, M.D. v. Thomson Newspapers (Wisconsin), Inc.*, 648 So.2d 866, 870 (La.1995). "[S]tandards used for summary judgment are somewhat higher in defamation suits," *Spears v. McCormick*, 520 So.2d 805, 808 (La.App. 3rd Cir.1987), and defamation plaintiffs bear "a burden of proof which is more onerous than usual." *Dwight W. Andrus Ins., Inc. v. Abellor Corp.*, 482 So.2d 1092 (La.App. 3rd Cir.1986). However, this Circuit has noted that following Louisiana law for summary judgment in defamation cases is "a wrong turn." *Doe v. Doe*, 941 F.2d 280, 287 (5th Cir.1991). "Federal courts ... are to employ the summary judgment standard of Fed.R.Civ.P. 56." *Id.*